## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUANITA MCDOWELL,

    **Plaintiff,**

    v.

THE GOVERNMENT OF THE
DISTRICT OF COLUMBIA, *et al.*

    **Defendants.**

**Civil Action No. 02-1119
(RWR/JMF)**

## MEMORANDUM OPINION

Currently pending and ready for resolution are the following motions: 1) Plaintiff's Renewed Motion to Compel Production of Spreadsheet and PD163s, Incorporating Points and Authorities ("Plains. Renewed MTC 5/18/05"), 2) Plaintiff's Motion for Leave to File Supplement to to [sic] Renewed Motion to Compel Production of Spreadsheet and PD 163s, 3) Plaintiff's Second Motion to Amend Plaintiff's Motion to Compel Production of Spreadsheet Required by this Court's Order Dated January 26, 2005 (Docket #63), Incorporating Points and Authorities (Plains. Sec. MTA 9/8/05") and 4) The Defendants the District of Columbia and Shanita Williams' Motion for a Protective Order and/or Reimbursement of Costs ("Defs. Mot. PO").  For the reasons stated below, plaintiff's first motion will be granted in part and denied in part, plaintiff's second and third motions will be granted, and defendants' motion will be denied.

## INTRODUCTION

Discovery in this case can be likened to a performance of the Theater of the Absurd.  It is time, once and for all, for the curtain to drop on this ridiculous production, or rather, non-

production, all too reminiscent of Waiting for Godot.[1]

## SELECT CHRONOLOGY OF EVENTS

On November 16, 2002, plaintiff propounded document requests seeking, *inter alia*, for the period from January 1, 1994 to the present, "[e]ach and every PD 163 . . . authored by, or describing an encounter with a civilian in which any of individual defendants or any member of 6D vice or any of Efraim Soto, Lonnie Moses, or Anthony McGee or Homer Littlejohn or Jonathan Jackson and any other District of Columbia employee on defendants' witness list and any of the individuals named on Attachment A [Ofc. S.D. Siegel, Ofc. G.M. Gulich and Officer Anthony Allen] was present or participated." Plaintiff's Motion to Compel Defendant District of Columbia to Respond to Plaintiff's Document Production Requests, Incorporated Points and Authorities ("Plains. MTC 2/3/03"), Exhibit 2 at 5, 15-16.  On February 3, 2003, plaintiff filed a motion to compel the production of the documents.

On August 19, 2003, plaintiff again propounded discovery requests, this time seeking copies of defendants' databases to learn whether CJIS[2] could generate a spreadsheet or index of arrest events by officer and arrest number. Plaintiff's Motion to Compel Defendant District of Columbia to Respond to Plaintiff's Computer Interrogatories and Document Production Requests; and Motion to Produce Witnesses for Deposition; and Motion to Extend Discovery Period, Incorporating Points and Authorities, Exhibit 1 at 1.  On October 13, 2003, plaintiff filed

---

[1] "ESTRAGON: He should be here.  VLADIMIR: He didn't say for sure he'd come. ESTRAGON: And if he doesn't come?  VLADIMIR: We'll come back tomorrow. ESTRAGON: And then the day after tomorrow.  VLADIMIR: Possibly.  ESTRAGON: And so on." The Samuel Beckett On-Line Resources and Links Pages, http://samuel-beckett.net/Waiting_for_Godot_Part1.html (last visited Feb. 8, 2006).

[2] Criminal Justice Information System.

2

a motion to compel the production of the databases.

On November 22, 2004, plaintiff again moved to compel the production of the PD 163's first identified in the November 16, 2002 request. Plaintiff's Motion to Compel Production of PD 163s and Related Documents, Incorporating Points and Authorities ("Plains. MTC 11/22/04") at 1-2.  This time, however, plaintiff limited the scope of the request to those arrests made between November 16, 1999 and the present. Id. at 6.

On January 26, 2005, I granted plaintiff's November 22, 2004 motion to compel and ordered production within ten days of the date of my order. Order ("Order 1/26/05") at 1.  I also directed defendants to keep track of the time they spent complying with my order. Id.  I did this because, although plaintiff argued that defendants could easily comply with the order, defendants argued that compliance would prove extremely burdensome in that it would be costly and require an expenditure of manpower resources that they simply did not have at their ready disposal. Id.

On February 9, 2005, defendants moved me for reconsideration of my January 26, 2005 order.  Without moving to stay the order, defendants also moved for an extension of time within which to comply with the order. Motion to Reconsider the Court's Order and/or to Enlarge the Time to Comply with the Court's Discovery Order at 1.  One day later, on February 10, 2005, defendants again moved for an extension of time within which to comply with my January 26, 2005 order.

On February 23, 2005, Judge Roberts held a status hearing.  At the hearing, the court learned that, although plaintiff had received a spreadsheet listing arrest events, plaintiff had not yet received the corresponding PD 163's. Plains. Sec. MTA 9/8/05, Exhibit 2 ("Tr. 2/23/05") at 4. The court also learned that defendants had begun producing PD 163's corresponding to the

arrests made by officers in the 6th District, but for a much greater time period than that specified in plaintiff's request. Id. at 19.  Defendants explained that they had done so in response to an earlier order of mine, which directed defendants to let me know how many PD 163's were generated within a six month period. Id. at 20.  Defendants further indicated that they also had proceeded to provide plaintiff with the corresponding PD 163's even though they were not directed to do so. Id. at 21.

Later in the hearing, defendants conceded that, because they had not filed a motion to stay my order of January 26, 2005 and because in fact that order was still in effect, requiring compliance by February 9, 2005, defendants were technically in violation of the order. Id. at 25. As a result, and in order to assist my resolution of the pending discovery issues, Judge Roberts ordered both parties to make a filing with the court by March 14, 2005 indicating which PD 163's had already been produced and which ones had not. Id. at 28.

On March 14, 2005, defendants moved for an extension of time within which to submit their discovery report.  That same day, plaintiff moved to compel compliance with my order of January 26, 2005.

On May 11, 2005, I denied defendants' motions for extensions of time. Order ("Order 5/11/05") at 2-3.  I also indicated that I would not entertain any further hardship motions relating to my order of January 26, 2005. Id. at 2.  Finally, I ordered the parties to submit a joint status report and indicated that defendants could illustrate therein, by an affidavit from someone in defendants' IT department, why compliance with my previous order was unduly burdensome. Id.

On May 16, 2005, in response to my order of May 11, 2005, the parties submitted a joint status report.

On May 18, 2005, plaintiff again filed a motion to compel.  Plaintiff supplemented the

motion on the same day.  In the motion, plaintiff identified those PD 163's that had not yet been

produced. Plains. Renewed MTC 5/18/05 at 8.  Plaintiff also identified the following problems

with defendant's production to date: 1) the spreadsheet was not in a format that made it possible

for plaintiff to manipulate the data, 2) the spreadsheet did not contain a complete list of all arrest

events for the designated officers for the specified production period, 3) the spreadsheet neither

captured arrest events where the designated officers assisted in the arrest nor were the

corresponding PD 163's provided, and 4) certain PD 163's authored by Homer Littlejohn within

the specified production period were either not listed on the spreadsheet or, if listed, were not

produced. Id. at 6-9.

On May 19, 2005, Judge Roberts held a status hearing and set another hearing for June

28, 2005.

At the June 28, 2005 hearing, Judge Roberts ordered the parties to file a joint report on

the status of discovery by August 1, 2005.

On August 1, 2005, the parties filed a joint report.  In their report, defendants indicated

that all PD 163's would be turned over to plaintiff by August 5, 2005, thus satisfying their

discovery obligations. The District of Columbia and Shanita Williams' and Plaintiff Juanita

McDowell's Joint Discovery Status Report ("Jt. Rpt. 8/1/05") at 1-2.

On August 8, 2005, by minute entry, the parties were ordered to file another joint report,

this time by August 19, 2005.

On August 18, 2005, the parties filed their joint report.  Defendants once again insisted

that they had complied with all outstanding discovery requests for PD 163's, but plaintiff

indicated both that the spreadsheet was incomplete and that not all PD 163's had been turned over. The District of Columbia and Shanita Williams, and Plaintiff Juanita McDowell's Joint Discovery Status Report ("Jt. Rpt. 8/18/05") at 1-2.

On September 8, 2005, plaintiff filed a renewed motion to compel. Again, plaintiff complained that defendants' most recent spreadsheet failed to capture all the arrest events requested by plaintiff and that defendants had still not produced all the corresponding PD 163's. Plains. Sec. MTA 9/8/05 at 3.

On October 3, 2005, I held an evidentiary hearing, the results of which will be discussed in greater detail below.

On December 30, 2005, plaintiff filed yet another memorandum detailing the on-going discovery disputes.

## THE PROBLEM

In a nutshell, it is quite clear from the painstakingly slow progression of discovery in this case that defendants' ability to retrieve the information sought by plaintiff is indeed as inadequate as plaintiff has repeatedly alleged. The discussion that follows reviews in detail the evidence that supports this conclusion followed by my proposed resolution of all outstanding discovery issues.

Throughout the course of discovery, plaintiff has had two primary complaints. First, that the spreadsheet has never captured all the data that she seeks and second, that defendants have failed to produce the corresponding PD 163's. In fact, even defendants' most recent spreadsheet failed to list certain arrest events that plaintiff knew existed by virtue of the fact that plaintiff

already had in her possession the corresponding PD 163's.[3]

I.      The Spreadsheet

        A.      Running the "Other Officer" Query in CJIS

        Since the beginning of discovery in this case, plaintiff has sought to query CJIS for

information about those arrests in which the individual named officers, while not the arresting

officer, nonetheless participated in some fashion in the arrest.  While defendants have repeatedly

acknowledged that CJIS contains an "other officer" field, defendants only recently conceded that

a query of this field can actually be performed.

        On May 16, 2005, in a signed, sworn declaration, Thelma James ("James"), then-Acting-

Manager of the Applications Support Branch of the Metropolitan Police Department ("MPD"),

stated the following: "Any information identified by the other officers field, or multiple officers

involved with an arrest is not retained by the CJIS system.  This information will have to be

obtained from the District of Columbia Superior Court." The Defendants District of Columbia

and Shanita Williams and Plaintiff Junita McDowell's Report Regarding Discovery ("Jt. Rpt.

5/16/05"), Exhibit 1 at 2.

        Several months later, on October 22, 2004, plaintiff deposed Sheila Tomalea Gantt

("Gantt"), an employee with the CJIS Data Conversion section of the Records Division of MPD.

Plains. Renewed MTC 5/18/05, Exhibit 13 at 5.  Gantt testified that the Data Conversion section

---

[3] Of the seventeen PD 163's already in plaintiff's possession in which the arresting or assisting officer was one of the individuals listed by plaintiff in her original document request, (excluding the two delinquency reports at line numbers 13 and 15 and excluding the arrest event for Dawkins, Carlton at line number 11 because it lists Officer Jackson in the narrative portion rather than in the arresting or assisting officer portion), only seven are listed on defendants' most recent spreadsheet.  Compare Memorandum Plaintiff's Post Hearing Filing ("Plains. Filing 12/30/05"), Exhibit 1 with Plains. Filing 12/30/05, Exhibit 3 at 20-36.

is responsible for making sure that the information contained on the PD-163's has been

accurately entered into the CJIS system by the booking officers. Id. at 5-6.  Although Gantt's

testified briefly about the "other officer" category in CJIS, her testimony on that topic was not on

point due to the nature of the questions posed.  First, plaintiff asked Gantt a series of questions

about whether or not a query can be done of all the arrests in which a particular officer may have

been involved.  Gantt's answer, however, suggested that Gantt believed the question concerned

only those incidents in which the officer at issue was actually the arresting officer:

> Q    Well, let's say I was looking for all the arrests that Officer
>      John Smith was involved in.
> A    Uh-huh.
> Q    Either, you know, in this screen that we just talked about, as
>      an arresting officer or as the papering officer, can I put a
>      query in CJIS that would tell me all of the arrests that he
>      had anything to do with?
> A    Yes, the arrests.
> Q    Which field would you - -
> A    You need the arresting officer's badge number and the
>      dates that you are interested in.
> Q    Uh-huh.
> A    Like with a query from what - - I mean, 2000 up to now, if
>      you wanted that information.  If the officer has, of course,
>      entered his - - this officer's name has been correctly entered
>      into CJIS, it would pull all the arrests for that badge
>      number.  It's querying the badge number, actually.

Id. at 82-83.

A similarly inconclusive result was reached by defendants' counsel:

> Q    So do you have specific information and knowledge that
>      you could go back and search CJIS for other officers
>      making arrests in the year 2000, or was that just an example
>      that you gave?
> A    If the officer was the arresting officer, you can go back and
>      search.
> Q    Right.  But I'm talking about other officers who were not

> arresting officers, not papering officers, but who were
> involved in the arrest but not otherwise listed in any of the
> paperwork?
>
> A     Not listed?
>
> Q     Right.
>
> A     No.  If they were not listed, there is no way of knowing.
> You know, like I said, on the first screen they have to
> indicate that it was.  Somewhere in the program we can pull
> that information back for a particular arrest.  But if they
> don't say there was another officer who assisted, there is no
> indication, then it's just that arresting officer.

Id. at 84-85.

This exchange hardly shed any light on the matter.  Clearly, if information is not entered into the system in the first place, it cannot be retrieved by a query of the database.  Although Gantt appeared to be testifying that no search of the other officer field is possible, she did not say so in exact terms and neither counsel asked her that specific question, even though both counsel were aware that this was the information plaintiff sought.

One year later, at the status conference held before me on October 3, 2005, conflicting testimony was again given.  One witness suggested that the "other officers" field could not be queried while another witness suggested that it could.

James, who in May of this year had provided a signed sworn affidavit in this matter, testified that, although there was a field within CJIS for "other" or "assisting" officers, there was no way to retrieve that information in a query. Tr. 10/3/05 at 30.  Later during her testimony, James indicated that she didn't actually know whether a CJIS query would be able to produce a list of "assisting officers" but that she would try to find out. Id. at 62.

> THE MAGISTRATE JUDGE:     So the bottom line is if I said,
> "All right, I want you to go
> back and tell me all the

|                          |                                                                                                                                                    |
|--------------------------|----------------------------------------------------------------------------------------------------------------------------------------------------|
|                          | arrests in the period of time made in which any of these eight people were assisting officers," your answer is, "I can't do that."                  |
| THE WITNESS:             | I'll say without further investigation, I'll go that way.                                                                                           |
| THE MAGISTRATE JUDGE:    | Well, investigation of what?                                                                                                                        |
| THE WITNESS:             | Looking at the program to see if it's actually being captured somewhere and looking at a couple of other fields, I could do that.                   |

Id. at 64.

James also noted that she though that this information could be obtained through D.C. Superior Court:

> BY MR. RICKMAN:
> Q     Now going back to the Other Officers field, what role does the D.C. Superior Court play within the Other Officers field?
> A     I think they have, you know, just the report or the - - I don't know exactly what they get over there.  This is what I was told, that that could tell you who the other officers were.
> Q     So what you're saying is that if someone wanted to inquire as to getting other officers involved in a particular arrest, they could obtain that information through the D.C. Superior Court?
> A     That's what I was told, mm-hmm.

Id. at 69.

Later in the hearing, Delores Hunter ("Hunter"), former Manager of the Records Branch at MPD, testified to the contrary, indicating that data from the assisting officers field *could* in fact be retrieved:

> Q     Describe what you know about the assisting officers field.
> A     I know that it's a field in the Criminal Justice Information

10

> System, which is the system that we use for booking
> records.  It's a field that's done on a Form PD-168.  There's
> a manual, there's a paper Form PD-168 that replicates the
> system version of that, which is a system view when you're
> booking the person at the district.  PD-168 is a view on the
> screen, on the booking screen; it's also a paper form that
> accompanies the paper work when a case is prepared for
> trial.

Q     Do you maintain copies of the PD-168?

A     We do not.

Q     And do you know of any way that MPD can retrieve data
that has been entered into the PD-168 for assisting officer
field?

A     I'm not a programmer, but any field values of the program
that is captured in the system can be retrieved through some
means by manipulating the program to pull that data up.

Id. at 96-97.

On October 20, 2005, almost three years after plaintiff's first request for production of

documents, defendants finally stated conclusively that data could be accessed for arrest events

where the named officer was not the arresting officer.  In James' most recent declaration, she

stated the following:

> 4.     On October 3, 2005, after the status hearing, I was again
> asked by the Office of the Attorney General for the District
> of Columbia to run a data query utilizing the "name 'or'
> badge number" for those same identified officers.  My
> previous inquiries were for "name and badge number."  I
> had previously told the Assistant Attorney General (AAG)
> assigned to the litigation that I could not gain access to the
> system to run a more detailed search because the system
> was limited to the D.C. Superior Court personnel.
>
> 5.     After the October 3, 2005 hearing, I researched and learned
> how to access "the assisting officer field" in the CJIS
> system.  I discovered that the field was called the "Officer
> Role" field.  I accessed the assisting officer field and
> located additional PD 163s for "all" arrests for the six
> identified officers for the period from 1999 to December
> 2004, and produced this information to the AAG on

October 19, 2005.

The Defendants District of Columbia and Shanita Williams' Supplemental Arguments to
Plaintiff's Motion for Sanctions, Exhibit 1 at 1-2.

A delay of this magnitude is not acceptable.

      B.      The Format of the Data

A second complaint plaintiff has about the spreadsheet is that what data was produced
was not in the format requested, one that plaintiff was capable of manipulating. Specifically,
plaintiff requested the data in an "asci delimited format or an Excel spreadsheet." Plains. MTC
11/22/04 at 2. According to James' October 13, 2004 deposition testimony, it would not be
difficult to produce the data in this format. Plains. Renewed MTC 5/18/05, Exhibit 14 at 17-18.
However, as recently as plaintiff's December 30, 2005 submission, the spreadsheet was still not
in a format that plaintiff could easily use. Plains. Filing 12/30/05 at 25. Specifically, plaintiff
seeks a spreadsheet that only lists one arrest event per line of data. Id. at 24. As the spreadsheet
was produced for plaintiff, both arrest events and charges were listed as separate lines of data. Id.
In other words, if a particular arrest event resulted in more than one charge, it would be depicted
on the spreadsheet on more than one line of data. Id. at 25. As a result, plaintiff was forced to
hire her own "IT consultant to reformat the spreadsheets (mainly by reformatting the date fields
and omitting certain charge data so each record would be on just one line) so the spreadsheets
could be sorted into chronological order." Jt. Rpt. 5/16/05 at 3.

      C.      The Scope of the Queries

In a joint status report to the court made as recently as May 16, 2005, defendants stated
that they were in compliance with the court's orders by producing "drug arrests for the Sixth

District of the Metropolitan Police Department for the time period beginning in 1999 to the present, and the drug arrests for the identified officers for a 10 year period." Jt. Rpt. 5/16/05 at 1. Defendants then listed the following officers: "Soto, Moses, McGee, Littlejohn, Jackson, Seigel, Gulich and Allen" Id. at 2.  To date, however, defendants have apparently still failed to run the right query.

First, the temporal scope of defendants' search was incorrect.  According to my Order of January 26, 2005, defendants were to have produced "a list of all arrests described in the document production request from November 16, 1999 (3 years before the date of the request which was November 16, 2002) up to the present." Order 1/26/05 at 1.  Although defendants stated in the text of their joint report to the court that queries for arrests for the 6th District were to run from 1999 to the present, according to Thelma James, whose declaration was attached to defendants' joint report, different date ranges were queried.  According to James, a date range of 1992 to March of 2004 was used to query arrests in the 6th District. Jt. Rpt. 5/16/05, Exhibit 1 at 1.

Second, defendants improperly limited the topical scope of their search to drug arrests, when in fact plaintiff sought information as to all types of arrests conducted by certain individuals within a certain time period.  According to my Order of January 26, 2005, defendants were to produce those PD 163's identified in plaintiff's original document request, dated November 16, 1999.  According to that request, plaintiff sought "[e]ach and every PD 163 and/or PD 251 and/or PD 252." Plains. MTC 2/3/03, Exhibit 2 at 15.  There is absolutely no reference in plaintiff's original request to drug arrests.  While a mistake of this nature is hardly significant in that it is easily remedied, what is troubling is the length of time it took defendants to recognize

13

their mistake, in spite of plaintiff's repeated attempts to obtain all arrests as opposed to just drug arrests.

Remarkably, the record indicates that as early as the February 23, 2005 status conference before Judge Roberts, defendants were told that plaintiff's request was not limited solely to drug arrests.  Addressing the apparent confusion, Judge Roberts stated the following: "I will leave it to you all to work out the details of why the District's submission was incorrect.  It clearly was not correct in interpreting the Judge's [Judge Facciola's] order as requiring production of all drug arrests in the Sixth District." Plains. Sec. MTA 9/8/05, Exhibit 2 at 39.  In spite of Judge Roberts' clarification, on May 16, 2005, defendants indicated that, in compliance with the court's January 26, 2005 Order, data runs were done for "drug arrests." Jt. Rpt. 5/16/05, Exhibit 1 at 1. Three months later, defendants again reiterated their mistaken belief that at the February 23, 2005 status hearing, plaintiff narrowed her discovery request to include only drug arrests and that these had been produced. The Defendants District of Columbia and Shanita Williams' Opposition to Plaintiff's Renewed Motion to Compel Discovery at 1-2.  On August 1, 2005, defendants again indicated that it had complied with the court's orders by producing the requested drug arrests. Jt. Rpt. 8/1/95 at 1.  Apparently, it was not until the October 3, 2005 evidentiary hearing before me that defendants finally understood that plaintiff's discovery request was not limited to drug arrests, Tr. 10/3/05 at 113-114, and not until October 20, 2005 that defendants supplemented their discovery. Jt. Rpt. 10/20/05 at 2.

II.    The PD 163's

The most obvious problem relating to the PD 163's is the fact that plaintiff will only get the relevant PD 163's if the spreadsheet is the result of a carefully worded and accurately

14

executed query.  There are, however, additional problems inherent in the system that make it

difficult for plaintiff to obtain the information she seeks.

One problem with defendants' system is that there is no mechanism in place for making

sure that the data is being properly entered into CJIS.  At the hearing held on Ocotber 3, 2005,

James testified as follows:

| | |
|---|---|
| THE MAGISTRATE JUDGE: | Once the arrest data is put in CJIS, does anyone thereafter check it for accuracy?  For example, we just ascertained there are brothers in the Police Department that have the same name.  Is there an internal system that would permit checks for accuracy? For example, let's assume a police officer put down the year 2008, the booking officers, which hasn't come yet, or got the badge number of any of that.  Who, if anyone, has the responsibility for checking the accuracy of the information as it is input? |
| THE WITNESS: | Right now, no one. |
| THE MAGISTRATE JUDGE: | No one checks it. |
| THE WITNESS: | We only find out if somebody comes up and says, "This is not right"; then they'll go back and research and then it will be changed by the Records Department. |

Tr. 10/3/05 at 32.

Later on in the hearing, James also noted that while defendants used to have a

programmer on staff, Monty Boone, he had left at least one year ago. Id. at 63.

15

A second problem with defendants' system pertains to the actual filing system itself. According to Hunter's testimony, the actual paper PD 163's are kept in filing cabinets, where they are filed by district, arrest number, or PD ID number:

> Our ultimate goal is to have them all filed by PD ID number.
> However, there are certain records that don't have PD ID numbers,
> that's a six-digit identifier.  Some people don't get PD ID numbers
> for minor offenses, quality of life offenses, and so those are filed
> by arrest number order.  And then there are those that are not filed
> in order yet, they're in a state of waiting to be filed in some order.

Id. at 89, 104.  Hunter also testified that although she had, in the past, attempted to update the system, she lacked the staff to do so. Id. at 103.

The third problem relating to the PD 163's has to do with simple fact that defendants lack adequate numbers of personnel who can be tasked with both filing and retrieving the documents. According to Hunter, in 2002, there were two staff persons available to do records checks of PD 163's but then there was just one file clerk who performed that function. Id. at 92.  Later in her testimony, when asked why it would be that certain PD 163's could not be found, Hunter stated the following:

> A      I guess when you're dealing with the number, with the
>         volume of records that we have, probably a misfiling could
>         be a reasons or sometimes if we don't have a way to check
>         and see if all the records were actually ever sent in that
>         were ever produced or created, so one of those two reasons
>         could be suspect.
> Q      So what you're saying is this is a manual system - -
> A      Yes, it is.
> Q      - - pretty much.  And so you're saying that you have no
>         means of checking to be certain that a PD-163 for any given
>         arrest on any given day made it to the Records Office.
> A      There is a way that you can do it, it's just that we don't
>         have staff to do that, we're too short-staffed to do that
>         function.

> Q.    Okay, and how many people do you have filing the PD-
>        163s?
> A.    One person now.
> Q.    And so there's a chance that that one person might misfile a
>        163 on occasion.
> A.    Absolutely, or not get around to filing it in the time of the
>        orders that I just mentioned to you previously.

Id. at 95-96

Hunter also testifies about the department's lack of follow up in terms of accounting for

missing files.

> Q    When you make a discovery that a PD-163 is missing, is
>       there any attempt made to obtain that PD-163 and put it in
>       your filing system?
> A    No, no.

Id. at 109.

## THE REMEDY

I.     Relief Sought

Plaintiff's theory of the case is that Officer S. Williams ("Williams") of the Metropolitan

Police Department violated her rights by conducting an illegal strip search and body cavity

search.  Plaintiff is suing both the District of Columbia and Williams, in her individual capacity.

As a result of the difficulties faced by plaintiff in trying to obtain discovery in this case,

plaintiff seeks an order granting summary judgment against the District as to the "practice of

allowing in the field strip searches or searches that involve viewing or touching inside the clothes

searches" as well as costs and attorneys' fees incurred by plaintiff as a result of defendants'

failure to produce the requested discovery materials, namely, the spreadsheet and PD 163's.

Plains. Filing 12/30/05 at 36.  Plaintiff moves under Rule 37 of the Federal Rules of Civil

Procedure.

II.       Rule 37

         In a recent opinion, I provided the following description of a court's powers under Rule

37:

> Under Federal Rule of Civil Procedure 37, a court may
> sanction a party that fails to comply with a discovery order. Fed. R.
> Civ. P. 37(b)(2).  The Federal Rules authorize a wide array of
> sanctions, including staying the proceedings pending compliance
> with a court order, taking certain facts as established, prohibiting a
> party from introducing certain matters into evidence, finding a
> party in contempt of court, and dismissing the action or any part
> thereof.  See id.  The court also has the authority to award
> reasonable expenses, including attorney's fees, caused by the
> failure to obey a court order "unless the court finds that the failure
> was substantially justified or that other circumstances make an
> award of expenses unjust." Id.
>
>                                      * * *
>
> District courts are entrusted with broad discretion regarding
> whether to impose sanctions under Rule 37, and the nature of the
> sanctions to be imposed. Bonds v. District of Columbia, 93 F.3d
> 801, 808 (D.C. Cir. 1996); Sturgis v. Am. Ass'n of Retired
> Persons, 1993 WL 518447 (D.C. Cir. 1993) (per curiam); Steffen
> v. Cheney, 920 F.2d 74, 75 (D.C. Cir. 1990)).  However, the
> court's discretion is not without limits.  Indeed, this Circuit has
> emphasized any sanctions awarded must be proportional to the
> underlying offense. Bonds, 93 F.3d at 808.

Caldwell v. Ctr. for Correctional Health and Policy Studies, Inc., 228 F.R.D. 40, 42 (D.D.C.
2005) (citing Peterson v. Hantman, 227 F.R.D. 13, 16 (D.D.C. 2005)).

III.      Factors for Consideration

         By requesting that the court granted summary judgment as to her claim that defendants

engage in a practice of allowing improper strip searches, plaintiff is in essence seeking a default

judgment.  In general, courts favor disposing of cases on their merits. Bonds v. District of

18

Columbia, 93 F.3d at 808.  Thus, courts must take care, especially when contemplating a

litigation-ending sanction, to ensure that it is proportional to the underlying conduct. Id.  This

care requires consideration of three factors: 1) the resulting prejudice to the opposing party, 2)

the resulting prejudice to the judicial system, and 3) the need to deter such behavior in the future.

Bonds v. District of Columbia, 93 F.3d at 808; Shea v. Donohoe Constr. Co., 795 F.2d 1071,

1077 (D.C. Cir. 1986); Caldwell v. Ctr. for Correctional Health and Policy Studies, Inc., 228

F.R.D. at 46; Webb v. District of Columbia, 189 F.R.D. 180, 189 (D.D.C. 1999).

A.      Prejudice to Opposing Party

Plaintiff argues that without the PD 163's, she cannot make out her Section 1983 claim,

also known as a "Monell claim." Plains. Filing 12/30/05 at 34.  In Monell v. Dep't of Soc. Servs.,

436 U.S. 658 (1978), the Supreme Court held that 42 U.S.C.A. Section 1983 claims can be

maintained against municipalities.  Liability only attaches, however, if plaintiff can prove that the

municipality itself caused the alleged constitutional violation. Kivanc v. Ramsey, No. 02-CV-

954, 2006 WL 20518, at *6 (D.D.C. Jan. 4, 2006) (citing City of Canton v. Harris, 489 U.S. 378,

387 (1989)).  Such proof exists in the form of "an official policy or custom," id. (citing Carter v.

District of Columbia, 795 F.2d 116, 122 (D.C. 1986)), including a municipality's failure to

adequately train or supervise its employees, where such failure rises to the level of "deliberate

indifference." Id. (citing Daskalea v. District of Columbia, 227 F.3d 433, 441 (D.C. Cir. 2000)).

In order to prove that defendants have a policy of deliberate indifference, plaintiff needs

to show that the behavior complained of was widespread.  Plaintiff's ability to do so is clearly

hindered by her inability to obtain the desired PD 163's.  Defendants' conduct is thus prejudicial

to plaintiff's ability to establish the necessary elements of a Monell claim.

B.     Prejudice to the Judicial System

Plaintiff argues that defendants' conduct has interfered with the court's ability to set a

trial date in this matter and that defendants have submitted "numerous false certifications" and

repeatedly failed to comply with the court's orders. Plains. Filing 12/30/05 at 29, 31.

It is true that defendants' actions have required in inordinate amount of the court's time,

both by myself and by the District Court Judge.  Had discovery run smoothly in this matter, the

court (collectively) would not have been tasked with eleven motions to compel thus far.

Nevertheless, as trial dates have not yet been set, the disruption of the court's calendar has not

been as great as it could have been.

C.     Deterrence

Plaintiff argues that "[a] sanction must be proportional to the misconduct under Rule 37

*only* when deterrence is the only rationale supporting it" and that because defendants' actions are

"so 'flagrant or egregious' as to be in bad faith, the proportionality test is met." Plains. Filing

12/30/05 at 35 (emphasis added).

First, the choice of sanction under Rule 37, whether mild or severe, is always "guided by

the 'concept of proportionality; between offense and sanction." Bonds v. District of Columbia,

93 F.3d at 808 (citations omitted).[4]  Second, defendants' actions in this case are not so flagrant

and egregious as to be in bad faith, i.e., with a malicious or evil intent.  Defendants are guilty

only of: 1) providing overly broad responses to plaintiff's requests for production of documents,

_____

[4] "The central requirement of Rule 37 is that 'any sanction must be just,' Insurance Corp.
v. Compagnie des Bauxites de Guinée, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492
(1982), which requires in cases involving severe sanctions that the district court consider whether
lesser sanctions would be more appropriate for the particular violation." Id.

and 2) operating in an environment that is short both on funding and staffing.  These two reasons

explain completely defendants' inability to comply with plaintiff's discovery demands.  That, as

plaintiff contends,[5] defendants filed numerous certifications attesting to the fact that the

"assisting officer" field could not be searched was not prompted by defendants' desire to hinder

production of the PD 163's, but rather, was based solely on defendants' understanding at the time

of the capabilities and limitations of MPD's record keeping system.  Similarly, that defendants

violated my order of January 26, 2005 by failing either to comply with the directives contained

therein or move for a stay is not evidence in and of itself of egregious behavior.  Rather, in light

of defendants' moving me to reconsider my order, albeit not on an emergency basis and not in

conjunction with an emergency motion to stay compliance, it is clear that defendants were

attempting to communicate with the court and plaintiff their inability to comply with the order in

a timely fashion.  This behavior, even in light of defendants' many motions for extensions of

time, can hardly be characterized as delay tactics orchestrated for the sole purpose of "keeping

the PD 163's from plaintiff." Plains. Filing 12/30/05 at 35.  Indeed, of all the things one may say

about the District's behavior in this case, that it was the product of a crafty, malevolent

intelligence, is not of them.

IV.     Completion of Outstanding Discovery

        In one of defendants' most recent filing with the court, dated November 17, 2005,

defendants indicated that an additional 1,100 arrests had been identified in their most recent

computer search.  Defendants also projected their ability to produce the corresponding PD 163's

given their current manpower and budgetary limits:

_____

[5] Plains. Filing 12/30/05 at 31.

21

| Personnel assigned | Man days required | completion date |
|---|---|---|
| 1 | 80 | 3/15/06 |
| 2 | 40 | 1/12/06 |
| 3 | 27 | 12/22/05 |
| 4 | 20 | 12/13/05 |

Defs. Mot. PO at 2.

Although useful, these projections are now out of date.  In addition, until discovery in this case has concluded, defendants have an ongoing obligation to comply with any outstanding orders.  Therefore, it would appear that defendants' calculations are no longer valid since, in compliance with my Order of January 26, 2006, the process of retrieving PD 163's is or should be ongoing.  Defendants will, therefore, be required to submit a current projection with the following information: 1) number of PD 163's remaining unretrieved, 2) hours required for one person to complete the task, 3) projected completion date for retrieval of half of the remaining PD 163's, and 4) projected completion date for retrieval of all of the remaining PD 163's.

Once that is done, I will set an inexorable deadline for the production of the remaining 163's.  If that deadline is not met, I will recommend to Judge Roberts that he give the jury the following instruction:

> You are instructed that, in this case, as you have heard, the District of Columbia was not able to produce all the arrest reports in which the named officers were either arresting officers or assisted in making a certain arrest.  It is well respected principle of the law that a party's failure to produce evidence in its possession or control permits you to conclude that, had it been produced, it would have been unfavorable to that party.  In this case, you may find that the District's failure to produce the arrest reports permits the conclusion that the District of Columbia had a policy and practice of having its officers make strip searches of persons, such

as plaintiff, who were arrested by those officers.[6]

V.      Sanctions

Plaintiff argues that no lesser sanction than the granting of summary judgment as to her

Monell claim will suffice.  The cases plaintiff cites, however, do not support such a harsh penalty

for the District's behavior.

In Fagan v. District of Columbia, 136 F.R.D. 5 (D.D.C. 1991), while the court noted that

the mere fact that defendants had difficulty locating information within their own files did not

protect them from their obligation to respond to plaintiff's discovery request, the court concluded

that defendants' burdensome claim was not "entirely unreasonable." Id. at 8.  Ultimately, the

court held that *even* an award of attorneys fees and costs was not justified. Id.

In Kozlowski v. Sears, Roebuck and Co., 73 F.R.D. 73 (D. Mass. 1976), another case

sited by plaintiff, while the court stated that "[t]o allow a defendant whose business generates

massive records to frustrate discovery by creating an inadequate filing system, and then claiming

undue burden, would defeat the purposes of the discovery rules," and while the court ultimately

upheld a previously-granted default judgment on the issue of defendant's liability, the facts in the

Kozlowski case are very different from the case at bar. Id. at 76.  In Kozlowski, plaintiff, a minor

---

[6] In support of its motion for a protective order, defendants argue that "[t]here is no
showing that any expanded scope of discovery will either result or lead to the discovery of
admissible information" and that "[t]he record reflects only one PD 163 was located that
indicated any type of 'strip search' out of the hundreds that have already been produced." Defs.
Mot. PO at 3.  First, the controlling criterion is the likelihood that the PD 163's will produce
information pertaining to how arrests were effectuated.  They are the only written source of that
information and therefore the only likely source of such information.  Second, defendants are
hardly in any position to argue that the evidence produced thus far suggests conclusively that
plaintiff is looking for a smoking gun where none exists.  Rather, the very issue before the court
is defendants' inability to provide plaintiff with the information she seeks.

who was injured when a pair of pajamas he was wearing ignited, sued the manufacturer and marketer of the pajamas.  Plaintiff's ability to pursue his products liability claim was thwarted, however, when one of the defendants refused to produce certain documents requested during discovery.  Significantly, the court found that defendant's failure to locate records within its own files as well as its failure to inquire of one of its co-defendants whether they had any responsive documents undercut defendant's claim that it had produced all available documents.  Noting that "[w]hile a judgment by default is the 'most severe in the spectrum of sanctions . . . provided in Rule 37 . . . it *is* appropriate where 'one party has acted in willful and deliberate disregard of reasonable and necessary court orders and the efficient administration of justice." Id. at 77 (citations omitted) (emphasis added).[7]  In other words, in Kozlowski, the court found that defendant had "willfully failed to comply with the discovery rules." Id.  Such a finding cannot be made in this case.

In the alternative, citing the case of Zenian v. District of Columbia, 283 F. Supp. 2d 36 (D.D.C. 2003), plaintiff argues that the court should order defendants to reimburse plaintiff's attorneys fees and costs. Plains. Filing 12/30/05 at 36.  As compared with Fagan and Kozlowski, the facts in Zenian are far more analogous to those in the case at bar.  In Zenian, plaintiff claimed

---

[7] See also Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) (holding that respondents failed to comply with discovery orders in a timely and adequate fashion "and concluding that the extreme sanction of dismissal was appropriate in this case by reason of respondents' 'flagrant bad faith' and their counsel's 'callous disregard' of their responsibilities."); Weisberg v. Webster, 749 F.2d 864, 871 (D.C. Cir. 1984) (holding, *inter alia*, that plaintiff's willful refusal to comply with court-ordered discovery warranted dismissal as a sanction); Webb v. District of Columbia, 189 F.R.D. 180, 186 (D.D.C. 1999) (holding that neither issue-related sanctions nor the imposition of attorneys' fees was adequate in light of defendant's "widespread and willful" illegal destruction of documents and in spite of counsel's corresponding "recalcitrance and silence).

that he was discriminated against because of his race when an individual of a different race was promoted instead of him. Zenian v. District of Columbia, 283 F. Supp. 2d at 36.  After defendant failed to turn over certain personnel files of plaintiff's co-workers, plaintiff moved for either a default judgment or for an order precluding defendant from arguing at trial that these individuals were more qualified than plaintiff. Id. at 37-38.  After plaintiff filed his motion, defendant turned over some but not all of the records sought. Id. at 38.  Defendant never explained the delay. Id.

In Zenian, a case which was before me, I concluded that 1) there was no significant disruption or delay to the judicial system because the trial date was not jeopardized and 2) plaintiff was prejudiced by having to move to compel. Id. at 38-39.  I did not assess whether or not there has been any resulting prejudice to the court because the record at the time was incomplete. Id. at 39.  Based solely on the known facts, however, I held that defendant's behavior justified the following remedy: 1) plaintiff was to be permitted to reopen discovery for limited purposes, 2) defendant was to be precluded from introducing certain late-discovered documents, and 3) the jury was to be instructed that it could conclude that the missing documents would have been favorable to plaintiff. Id.  See also Caldwell v. Ctr. for Correctional Health and Policy Studies, Inc., 28 F.R.D. at 46 (holding that plaintiff was entitled to attorneys fees' for having to move to compel defendant's answers to interrogatories but that he was not entitled to a default judgment because 1) defendant's misconduct did not severely prejudice plaintiff, 2) the court was not intolerably burdened and 3) the imposition of attorneys' fees would act as a sufficient deterrent against similar behavior in the future).

As in Caldwell, an award of attorneys fees is indeed warranted here.  But for the inefficiencies in defendants' filing system, taken as a whole, discovery in this case would never

have dragged on as it has.  Such an award, therefore, coupled with a carefully worded instruction to the jury, explaining that a negative inference may be drawn from defendants' inability to locate information within its possession, will more than suffice.

## CONCLUSION

Defendants' conduct in this case, while exasperating, in no way suggests any underlying bad faith.  The resulting prejudice to the court is not as great as it could have been, because trail dates have not yet been set.  On the other hand, the resulting prejudice to plaintiff, the probable inability to obtain the discovery necessary to make out her <u>Monell</u> claim, is significant. However, this resulting prejudice, coupled with the need to deter such behavior in the future, can be adequately remedied by the imposition of attorneys' fees and costs against defendants and the possibility of a jury instruction that addresses plaintiff's lack of evidence as to her <u>Monell</u> claim.

An Order accompanies this Memorandum Opinion.


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: